[No. 18407.   Department Two.—July 12, 1895.]

## JAMES WHOLEY, RESPONDENT, *v.* LEONA J. CALD-WELL ET AL., APPELLANTS.

RIPARIAN RIGHTS — NATURAL CHANGE OF STREAM — RIGHTS OF LOWER PROPRIETOR.—While a lower riparian proprietor, as against the unwarranted act of an upper proprietor, is entitled to have the water enter his land by its accustomed channels, and to have each channel carry its due amount of water; yet, where a change in the channel of the stream has been caused, not by the act of man, but by natural causes diverting the bed of the stream from his land, he has no right to insist that the water which has flowed upon his land shall always flow upon it, or to enter upon the land of upper riparian proprietors to turn the water back into its former channel, so as to flow upon his own premises.

ID.—SOURCE OF RIPARIAN RIGHTS—LAWS OF NATURE—NATURAL LOSS OF FLOW.—Riparian rights draw their support from the laws of nature, and rest upon the maxim adopted by the common law from the civil law, that water runs and ought to run as it was accustomed to run by the law of nature, and they do not rise superior to the laws of nature, and when, by the operation of those laws, the flow is lost the right is lost with it.

APPEAL from a judgment of the Superior Court of Siskiyou County.   J. S. BEARD, Judge.

The facts are stated in the opinion of the court.

*L. F. Coburn*, for appellants.

The owner of land owns all its products and accessions, and every thing beneath or above it.   (Civ. Code, secs. 722, 829.)   The change of the stream to a new channel was natural and was caused by the act of God, for which no one is responsible.   (Civ. Code, sec. 3526.) There can be no entry by the plaintiff on defendants'

land to change the new channel of the creek to its former channel. (Gould on Waters, sec. 325, note 5; *Nevada Water Co.* v. *Powell,* 34 Cal. 109; 91 Am. Dec. 685.) The right of a riparian proprietor is annexed to the soil and extends no farther than the boundary of his estate. (*Lux* v. *Haggin,* 69 Cal. 255.) The defendants have the right to the undiminished flow of the water through the new natural channel upon their land. (Black's Pomeroy on Riparian Rights, secs. 7, 8; Gould on Waters, sec. 204; Angell on Watercourses, sec. 95; 3 Kent's Commentaries, 439; *Heath* v. *Williams,* 25 Me. 209; 43 Am. Dec. 269–79.) A watercourse running between the lands of A and B which leaves its course and suddenly and sensibly runs on the land of A wholly. belongs to A. (Angell on Watercourses, sec. 57, and authorities therein cited; 3 Kent's Commentaries, 525; Gould on Waters, sec. 160, note 5.)

*James F. Farraher,* for Respondent.

An appropriator, or riparian owner, has the right to have the waters of the stream flow to his ditch or land in its accustomed channels. (*Lower Kings River etc. Co.* v. *Kings River etc. Co.,* 60 Cal. 410; *Heilbron* v. *Kings River etc. Canal Co.,* 76 Cal. 12; *Lux* v. *Haggin,* 69 Cal. 255; *Rigney* v. *Tacoma etc. Co.,* 9 Wash. 576; *Kay* v. *Kirk,* 76 Md. 41; 35 Am. St. Rep. 408; Black's Pomeroy on Riparian Rights, secs. 8–10; Angell on Watercourses, 7th ed., secs. 96, 142.) This right is in the nature of an easement. (Civ. Code, sec. 801; *Ware* v. *Walker,* 70 Cal. 591.) This right carries with it such secondary easements as are essential to its enjoyment. (Angell on Watercourses, secs. 158–60.) When the primary source is a running stream in a well-defined channel its disappearance in one place and reappearance in another will not destroy its character as a stream or justify cutting it off. (*Cross* v. *Kitts,* 69 Cal. 222; 58 Am. Rep. 558; *Brown* v. *Ashley,* 16 Nev. 311, 317; *Hale* v. *McLea,* 53 Cal. 578; *Ely* v. *Ferguson,* 91 Cal. 188; *Willis* v. *City of Perry* (Iowa, Oct. 22, 1894), 60 N. W. Rep. 728.)

HENSHAW, J.—Appeal from the judgment. Plaintiff
is a lower, defendants are upper, riparian proprietors.
Parks creek for many years had flowed over the land
of defendants to a point on that land known as Batterton
crossing, where it divided into two branches called the
North Channel and the South Channel. About one-third
of the waters of the creek passed onto the plaintiff's
land through the North Channel, while the remaining
two-thirds flowed down the South Channel. A third
waterway, seemingly an ancient course of Parks creek,
left the main stream about one-half a mile above Batter-
ton crossing, and entered upon and extended over the
land of plaintiff in a direction parallel with that of the
North Channel. This last waterway was known as the
Spring Branch Channel. There was no direct surface
flow from Parks creek into it, the point of separation
being dammed by gravel, bowlders, and debris, but its
bed was lower than the bed of the North Channel, and
from North Channel, by percolation and by small but
defined surface streams, water rose in this Spring Branch
Channel and flowed over plaintiff's lands. The amount
of water so rising bore direct relation to the amount of
water flowing through the North Channel. Plaintiff
relied upon the waters of the Spring Branch and North
Channels for all beneficial purposes.

Such were the conditions until the winter of 1890–91,
when an extraordinary freshet deposited a bar of bowl-
ders, gravel, and debris at the head of the North Channel,
and thus prevented the waters from flowing into it as
had been their wont. At the same time the waters cut
a new bed for themselves. This New Channel (so
named) left the original stream from the south about a
mile above Batterton crossing, extended in a general
course parallel with it, and joined the South Channel,
still on the lands of defendants, above the point where
South Channel entered plaintiff's property, and thence
flowed on by the accustomed South Channel. During
the first year after this change some of the water passed
down the old way to Batterton crossing. The rains of

the following year deposited a bar in the main stream at the point where the New Channel had been cut, and thereafter all the waters of the creek flowed down this New Channel into the South Channel, and so onto defendants' lands, leaving dry the original watercourse down to Batterton crossing, and, consequently, also the North Channel and the Spring Branch Channel.

Plaintiff then commenced this action, averring that these changes were occasioned wholly by natural causes, and asserting the right to enter upon defendants' land and to take such necessary and proper steps as might be required to return the water to the channels wherein it flowed prior to the year 1889, and asking that defendants be enjoined from preventing him from entering upon their land and doing such proper and necessary acts. He also pleaded a grant to himself from defendants' predecessor of his land and of "the waters accustomed to flow in the Spring Branch Channel." Defendants denied the asserted rights, and by cross-complaint pleaded the construction and maintenance for thirty years last past of a dam across the head of the North Channel sufficient to divert all the water thereof, during ordinary low stages, from the North to the South Channel, and also their prescriptive right to divert two-thirds of the water of the creek by ditches. They pleaded defendants' interference with these rights, and asked damages accordingly.

Plaintiff was denied an injunction, but, as riparian proprietor and as grantee under the deed above mentioned, was decreed the right of "restoring and restraining the waters of Parks creek to the following channels: 1. From the point where the New Channel cut from and left the former channel (original bed of the stream) down said former channel in a single body to the Batterton crossing; 2. From the Batterton crossing in two channels in the following proportions, to wit: One-third through the said North Channel and the remainder through said South Channel."

We cannot see that the rights of the parties in this

action are in any way affected by the grant to plaintiff "of the waters accustomed to flow in the Spring Branch Channel." *Aqua cedit solo.* This grant accompanied the grant of the land bordering upon that channel. Whether the waters which flowed in it came from the North Channel by percolation and seepage or by well-defined subterranean or surface channels can here make no difference. For, in either case, the utmost that could be claimed for the grant would be that it gave plaintiff full right to the waters against any asserted right of the defendants to them, and protected him from any use which defendants might make of the waters of the creek after the grant, to the injury of their right in these waters.

But the complaint of plaintiff does not declare upon any such invasion or infringement by defendants. It asserts the right to go upon the land of an upper riparian proprietor and return a stream to its original channel which has been diverted therefrom suddenly and sensibly by natural causes. And plaintiff's warrant in doing this rests not upon any contractual relations with defendants, but upon his prerogatives as a lower riparian proprietor.

We do not attach importance to the contention of appellants that the right of the lower riparian proprietor is merely to have the water enter his land by its accustomed channels without regard to the quantity which these channels are wont to carry. The lower proprietor, as against the unwarranted acts of the upper, is entitled not only to have the water enter his land by its accustomed channels, but to have each channel carry its due amount of water. Any other rule would lead to untold hardship and oppression.

But we are here concerned only with the rights of the lower proprietor where the change in the channel has been caused not by the act of man, but by the act of God. Does the right of the riparian proprietor to have the water enter his land by its accustomed channels stand superior to changes wrought in the flow of a

stream by the act of Providence?  Has such a proprie-
tor a paramount right over the forces of nature, as well
as over the acts of man, to insist that water which has
once flowed upon his land shall always flow upon it?

A somewhat extended examination leads to the con-
clusion that the assertion of such a right is new to
jurisprudence.  The right finds no recognition by the
commentators of either the civil or common law, and no
case has come under our observation in which the ques-
tion is considered.  Even Sir Matthew Hale, whose *De
Jure Maris* is declared by Chancellor Kent to have
exhausted the learning on the subject, makes no men-
tion of so important a topic.  This silence is itself sig-
nificant.  For it is not easily to be believed that if this
important right exists it would not have been asserted
and announced in numerous instances.

While thus lacking in authority it is certain that the
contention cannot find better support from principle or
reason.  The foundation of the riparian proprietor's
rights rests upon the universally accepted maxim adopted
by the common law from the civil law: *Aqua currit, et
debet currere ut currere solebat ex jure naturæ.*  These rights
thus draw their support from the laws of nature, but
they do not rise superior to those laws.  When, by their
operation, the flow is lost the right is lost with it.  The
new channel itself becomes the natural channel.  Other-
wise a riparian proprietor would hold all lands above
him in extraordinary and perpetual servitude.  If, by
the forces of nature, the stream should change its course
at a point miles above him he would still be empowered
to subject any and all of the intermediate territory to
operations requisite to enable him to turn the water back
upon his own premises, and this power would be his to
the very fountain-head of the stream.  Such a doctrine
could not be tolerated.

If it be needed, however, the reasoning of the fore-
going finds abundant support in analogous principles
of the law which are firmly established.  Says Sir
Matthew Hale (Hale's *De Jure Maris,* c. 1): "A water-

course running between the lands of A and B, which leaves its course and suddenly and sensibly makes its channel wholly upon the land of A, belongs wholly to A." This rule has been reannounced by all the later text-writers, and has been adopted by the courts without suggestion of dissent. (3 Kent's Commentaries, 428; 2 Blackstone's Commentaries, 262; Angell on Watercourses, sec. 57; Gould on Waters, sec. 159, and cases thereunder.) True, it has usually been invoked in cases of boundaries and of the accretion and reliction of land, but nevertheless, by necessary implication, it defines the riparian proprietor's right in the matter under consideration. Because, if the stream belongs wholly to A, thus depriving B of all his riparian rights, this can only result because B has no right to go upon another's land and restore to the old channel the water which has been diverted therefrom *ex jure naturæ.*

For the foregoing reasons the judgment is reversed and the case remanded.

McFARLAND, J. and TEMPLE, J., concurred.

Hearing in Bank denied.